for completing the paperwork involved in the export of the items belonged to CHU and ZHU. CHU asked how he should describe the product, and UCA 2 stated that it was CHU's responsibility. UCA 2 stated that the problem in exporting products from the U.S. was that the authorities might compare the description listed on the paperwork to the products being shipped. CHU showed UCA 2 a Chinese newspaper article, and stated that a female Chinese national was arrested and sentenced to eight months in jail for a similar crime. CHU further stated that "she" was only sentenced to eight months because she was cooperating with the government in their investigation. CHU further stated that last year, twice as many people were arrested for this type of crime as the year before. UCA 2 said that was why they needed to be careful. UCA 2 stated that CHU's biggest responsibility was not to get caught. CHU stated that 30 people worked for ZHU's company in Mainland China, and only a few people in Hong Kong. CHU stated that he would look into diverting the shipment through the Philippines.

107. UCA 2 asked about future deals, including the GyroChips. CHU stated that ZHU wanted to make a few other deals first because the GyroChips were so sensitive. UCA 2 stated that the problem was that all of these things are controlled. CHU attempted to contact both ZHU and BAI unsuccessfully during the lunch meeting. When asked by UCA 2, CHU acknowledged that BAI and ZHU already had the SAC Boston U/C Company's banking information. CHU stated that he had to return to the office to further mark the boxes. CHU stated to UCA 2 that he could bring additional customers to UCA 2 that ZHU did not have. CHU stated that he would be very careful with the Vicor sale. CHU stated that ZHU's company has a very good relationship with the Chinese government. CHU stated that the United States does not like China, because China is putting stuff, which UCA 2 understood to mean satellites, in the sky. CHU acknowledged that he is paid a commission and minimum salary by ZHU. CHU stated that the

competition is tough, and that there are a lot of people engaged in this kind of business. UCA 2 and CHU departed the restaurant at approximately 1:56 p.m. to return to the office to mark and seal the boxes. CHU departed the office at approximately 2:20 p.m.

108. Later on April 20, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he would arrange payment for the Vicor parts. BAI asked if it was safe to wire the payment directly from the Hong Kong account.

109. On April 21, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that the money would be wired from a Hong Kong personal account. BAI further wrote that he thought that this would be safe for UCA 2. BAI wrote that his customer had placed the order for the TWTs, but needed the price reduced to $30,000.00 per unit.

110. On April 21, 2004, UCA 2 contacted CHU at telephone number 626-437-2370. The phone call was recorded, and UCA 2 recognized the voice as CHU. CHU stated he had spoken to BAI, and that he, ZHU and BAI were concerned that this was risky. UCA 2 acknowledged that "this" was a risky business. CHU stated that this was the first deal, but that if this deal were to go successfully, then there would be a lot of additional deals. CHU stated that they (which I understand to refer to BAI and ZHU) wanted to take delivery of $40,000.00 worth of product (the amount of the deposit). CHU further stated that they would wire additional money. UCA 2 stated that he did not want to have the money wired from Mainland China as it could cause problems. UCA 2 stated that this business was a risk to all involved. CHU stated that they (which I understand to refer to BAI and ZHU) wanted to test the product upon receipt.

111. Also on April 21, 2004, UCA 2 received a telephone call on the SAC Boston U/C cellular telephone from telephone number 626-437-2370. The phone call was recorded, and UCA 2 recognized the voice as CHU. The person on the telephone identified himself as John

-42-

CHU. CHU stated that the money would be paid via wire from Hong Kong. CHU further stated that "they" are collecting the money, and would wire it shortly. CHU stated that he was told to return to Los Angeles until the money was paid. CHU stated that this was risky. UCA 2 acknowledged that this was risky.

112. Also on April 21, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI requested the SAC Boston U/C company banking information, and said he would wire the payment "next Monday". BAI further requested a product data sheet for the TWT VTU5192A7A.

113. On April 21, 2004, UCA 1 contacted BAI via the 963.net address. UCA 1 confirmed with BAI that CHU had successfully inspected the Vicor parts. UCA 1 confirmed the SAC Boston U/C company's banking information with BAI. UCA 1 further wrote that as BAI had requested, the TWT sale had not been discussed with CHU. UCA 1 further wrote that he could meet BAI's requested price of $30,000.00 per unit on the TWTs. UCA 1 forwarded the product specifications for the VTU-5192A7A TWT.

114. On April 26, 2004, UCA 1 contacted BAI via the 963.net address. UCA 1 wrote that he had not received the final payment for the Vicor products. UCA 1 requested an update on the payment, and also on the sale of the TWTs.

115. Also on April 26, 2004, UCA 2 attempted to contact CHU at telephone number 626-437-2370, but the call went to voice mail. The phone call was recorded. UCA 2 left a voice mail message for CHU to contact him.

116. Also on April 26, 2004, CHU contacted UCA 2 from telephone number 626-437-2370. The telephone call was recorded, and UCA 2 recognized the voice as CHU. CHU stated that he had attempted to contact "them". CHU stated that he had spoken to ZHU, and that ZHU

was trying to collect the money (for the Vicor product). CHU stated that he felt they would wire the money soon. CHU stated that ZHU would be in the United States at the end of the month. CHU stated that he had just returned to Los Angeles the previous day. UCA 2 requested that CHU contact him at the office the next day.

117.    Later on April 26, 2004, CHU contacted UCA 2 on the SAC Boston U/C company telephone. The phone call was recorded, and UCA 2 recognized the voice as CHU. CHU stated that he had spoken to ZHU, and that ZHU was going to wire the money right away. CHU stated that it would probably take 48 hours for the money to be wired. CHU further stated that ZHU would speak with UCA 2 on the next sale. CHU stated that at the end of the year, the market may open, so that they only had one year for "this type" of deal. CHU stated that ZHU would probably not come, CHU stated that he would pick up the product himself, and that on next sale, he and ZHU would visit UCA 2. CHU stated that ZHU could not get a visa right now. Subsequently, UCA 2 confirmed with DOS that in fact, ZHU already had a valid visitor's visa.

118.    On April 26, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he would wire the payment (for the Vicor product) shortly. BAI further wrote that he had received the data sheets for the TWTs. BAI stated that he had an agreement from the customer for 30 "pcs", and would place the order after receipt of the Vicor parts. BAI further requested that UCA 2 keep the "3 pcs" he had on hold, and that "we" will take them soon. BAI further wrote that if everything goes well, he had a lot of business. BAI stated that after he wired the payment, he would fax the bank receipt.

119.    On April 27, 2004, UCA 1 contacted BAI via the 963.net address. UCA 1 acknowledged that BAI's customer wished to purchase 30 "pcs" of the TWT. UCA 1 clarified that the manufacturer currently had 2, not 3, "pcs" in stock . UCA 1 requested BAI to forward a

-44-

purchase order along with a 10% down payment for the TWTs. UCA 1 further wrote that as the TWTs are "sensitive" items like the Vicor parts, the TWTs would be delivered in the same manner as the Vicor parts, that is, domestically in the United States. UCA 1 asked that if he was not able to discuss the TWT sale with CHU, how he was to proceed with the inspection and delivery of the TWTs.

120.  On April 28, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI requested a quote on the following Vicor items:

| Part Number | Quantity |
|---|---|
| MI-FIAM5M21 | 20 pcs |
| MI-A22-MU | 10 pcs |
| MI-J20-IZ | 16 pcs |
| MI-J20-MZ | 18 pcs |
| MI-J20-MY | 75 pcs |
| MI-J22-MZ | 156 pcs |
| MI-RAM-M1 | 20 pcs |

BAI gave the following contact information:

| | |
|---|---|
| Tel: | 86-755-83665581 |
| Fax: | 86-755-83665098 |
| Mobile: | 86-1380-256-2428 |

121.  On April 28, 2004, UCA 1 contacted BAI via the 963.net address. UCA 1 gave the following quote on the Vicor items requested in BAI's e-mail dated April 28, 2004. The sales prices given were as follows:

| Part Number | Quantity | Price per unit | Total |
|---|---|---|---|
| M-FIAM5M21 | 20 pcs | $182.00 | $ 3.640.00 |
| MI-A22-MU | 10 pcs | $176.00 | $ 1,760.00 |
| MI-J20-IZ | 16 pcs | $151.00 | $ 2,416.00 |
| MI-J20-MZ | 18 pcs | $280.00 | $ 5,040.00 |
| MI-J20-MY | 75 pcs | $270.00 | $20,250.00 |
| MI-J22-MZ | 156 pcs | $250.00 | $39,000.00 |
| MI-RAM-M1 | 20 pcs | $151.00 | $ 3,020.00 |
| Total: | | | $75,126.00 |

In this e-mail, UCA 1 wrote that he had not received the final payment of $114,100.00 for the Vicor products as per BAI's P/O # NCB0402102.

122.   Also on April 29, 2004, UCA 2 contacted BAI via telephone number 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-2562428. An audio recording was made of this telephone call. The individual on the receiving end to the call identified himself as BAI. The telephone connection was poor, and the call was terminated.

123.   Also on April 29, 2004, UCA 2 again contacted BAI via telephone number 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-2562428. The individual on the receiving end of the call identified himself as BAI, and UCA 2 understood him to be the same person he had spoken to by telephone on March 19, 2004. An audio recording was made of the telephone call. BAI stated that he would be transferring $57,000.00 that day as half of the final payment (for the first Vicor shipment), and that on May 2, 2004, the final payment would be sent. BAI indicated that final payment for the Vicor products was going to be split in half, in order to minimize scrutiny by authorities. BAI further stated that he would be sending a deposit for the TWT sale in the amount of $6,000.00, also on May 2, 2004. BAI further requested that he wanted 10 pieces immediately. BAI further requested that UCA 2 have 2 pieces of the TWT, and that he would order an additional 10 pieces to make the total quantity of the order 40 pieces (of TWT). BAI further stated that he did not want UCA 2 to speak with CHU about the TWTs, and that ZHU would contact UCA 2 about the sale of the TWTs. UCA 2 asked BAI if ZHU would meet with him (UCA 2), and BAI stated that ZHU would send an interpreter. BAI indicated that ZHU would be sending "a couple of guys" to contact UCA 2 to "handle this business". BAI stated that a person would contact UCA 2 the following week. UCA 2 requested contact information for the person who would

accompany ZHU, and BAI stated that the person would contact UCA 2 the following week. BAI stated that his boss, ZHU, was the person who was requesting the TWTs, and BAI further requested delivery dates in separate lot amounts of 10 pieces.

124. Also on April 29, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he had wired half of the balance (for the Vicor products subject to BAI's P/O # NCB0402102), that is, $57,050.00. BAI further wrote that he would fax a bank receipt reflecting the payment to the SAC Boston U/C company. BAI further wrote that "we" would make a final transfer of payment on May 2, 2004, together with the down payment for the 2 pieces of the TWTs. BAI further wrote that following the first shipment of the Vicor product, he would purchase "a lot" of Vicor parts. BAI further wrote that "we" would purchase 40 pieces of the TWT (part number) VTU-5192A7A. BAI further requested that the first 2 pieces of TWTs be made ready for shipment.

125. Also on April 29, 2004, based on product specifications submitted to the Exodus Command Center, License Determination 04-114-01 determined that the CPI part number VTU-5192A7A, a pulsed traveling-wave tube amplifier, is listed on the United States Munitions List, Category XI (c), and therefore is controlled for export by the U.S. Department of State, and requires an export license. As such, CPI part number VTU-5192A7A cannot be exported to the P.R.C., which is an embargoed country for export of Munitions List defense articles.

126. On April 29, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that "in view of our future cooperation, Mr. ZHU will pay a visit to you around May 4, 2004." BAI further asked, "Do you think the situation is good enough for Mr. ZHU to visit USA? Please confirm w(h)ether it is safe enough for Mr. ZHU to visit you at this time. If yes, please confirm."

127. Also on April 29, 2004, the SAC Boston U/C company contacted BAI at the 963.net address. UCA 1 wrote that he had not received the first half of the final payment as of that afternoon. UCA 1 further wrote that he felt it was safe for ZHU to visit Boston the following week. UCA 1 further wrote that he was concerned that additional people would be involved in these sales, and further that these people must understand the sensitivity of the sales. UCA 1 wrote that if he were to receive the down payment for the CPI TWTs soon, he could have the two sample units ready for ZHU's inspection next week. UCA 1 further requested a purchase order be submitted from BAI for the entire order of 40 pieces of TWTs.

128. On April 30, 2004, UCA 2 contacted CHU at telephone number 626-437-2370. The individual who answered the telephone was identified as CHU. The phone call was recorded, and UCA 2 recognized the voice as CHU. UCA 2 stated that he had not received the money for the Vicor products. CHU stated he had contacted them (which I understand to refer to BAI as the point of contact), and that they had wired the money the previous day. CHU stated that BAI had wired the "rest of the amount." CHU stated that he would remain in the Los Angeles area until the end of next week (week of May 2, 2004), at which point he would probably travel to Boston.

129. Also on April 30, 2004, a wire transfer was received into the SAC Boston U/C company bank in the amount of $57,032.00. This payment represented the first half of the final payment for the Vicor products. The SAC Boston U/C company was not aware of the transfer until Monday, May 3, 2004.

130. On May 3, 2004, UCA 2 contacted BAI at telephone number 011 86 1380 256 2428. The individual on the receiving end of the phone call identified himself as BAI, and UCA 2 understood him to be the same person he had spoken to by telephone on March 19 and April

-48-

29, 2004. The phone call was recorded. BAI asked if UCA 2 had met ZHU. BAI stated that ZHU was traveling to see UCA 2, and that he had already left. BAI stated that ZHU had been told to meet UCA 2 on either May 6 or 7, 2004, and that he (ZHU) would be in Boston at that time. BAI stated that CHU would probably be traveling with ZHU. UCA 2 stated that he had not received the money for the Vicor. BAI stated that approximately $57,000.00, had been wired that morning by his bank. BAI stated that the deposit for the TWTs had not been sent yet, and stated that his boss would talk about the TWTs with UCA 2. BAI stated that the remaining balance for the first Vicor shipment had already been sent. BAI stated that the first payment had been sent on April 29, 2004, and that the second payment was being made in the morning (May 4, 2004 in China). BAI stated that he was moving into a new office, and he did not have a fax. BAI stated that it would take two or three days for the wire transfer to be completed. BAI stated that ZHU would contact UCA 2 on his cellular telephone. BAI stated that ZHU would talk to UCA 2 in person about the sale of the TWTs.

131. Also on May 3, 2004, the SAC Boston U/C company bank account received a wire transfer in the amount of $57,032.00. This payment represented the second half of the final payment for the Vicor products.

132. Also on May 3, 2004, UCA 2 contacted BAI via the 963.net address. UCA 2 wrote that he had received the wire transfer of $57,032.00 (the April 30 wire transfer), and directed BAI to a fax transmission. The fax is described below. The fax failed to transmit successfully.

133. Also on May 03, 2004, UCA 2 faxed a message to CHU at telephone number 626-300-8188. UCA 2 wrote that he had received BAI's wire transfer of $57,032.00 representing the first half of the balance for payment for the Vicor shipment. UCA 2 further

wrote that he had spoken to BAI that morning and BAI had informed him that ZHU had arrived in the United States. UCA 2 further wrote that he would not be available to meet with ZHU and CHU until May 6 or 7, 2004.

134.    Also on May 3, 2004, UCA 2 contacted BAI via the 963.net address. UCA 2 wrote that he had just received notification that the fax attachment from e-mail above had not transmitted successfully. UCA 2 sent the fax attachment again.

135.    Also on May 3, 2004, UCA 2 attempted to contact CHU at telephone number 626-437-2370, but the call went directly to CHU's voice mail. The phone call was recorded. UCA 2 left a voice mail message in which he stated that he had received the payment for the Vicor parts. UCA 2 further stated that he had spoken to BAI regarding the same matter, and requested CHU to contact him.

136.    Later on May 3, 2004, UCA 2 again attempted to contact CHU at telephone number 626-437-2370, but that call also directly to CHU's voice mail. The phone call was recorded. UCA 2 left a message confirming that he would be able to meet with CHU and ZHU on the following Thursday, and Friday (May 6 and 7, 2004).

137.    Also on May 3, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he had received UCA 2's message and would advise CHU.

138.    Also on May 3, 2004, CHU contacted UCA 2 via the SAC Boston U/C company cellular telephone. The phone call was recorded, and UCA 2 recognized the voice as CHU. CHU stated that ZHU had CHU's cellular telephone. UCA 2 stated that he had sent a fax to number 626-300-8188, and CHU stated that he had not gone to the office that day. CHU said that ZHU was going to an exhibition in Boston on May 4 - 6, 2004. CHU asked if UCA 2 could meet on Wednesday, May 5, 2004. UCA 2 stated that it would be better to meet on Thursday

-50-

May 6, 2004. CHU stated that Thursday would be fine. CHU stated that he would make travel arrangements and then would give that information to UCA 2. CHU stated that he and ZHU would like to stay in a hotel near the airport. UCA 2 stated that he would try to make reservations at a hotel for him. CHU stated that he was going to the NEPCON East Electro trade show (concerning sophisticated electronics) in Boston. CHU stated that they would try to make arrangements to travel into Boston for Wednesday, May 5, 2004, and they would be leaving on Thursday (May 6). CHU gave UCA 2 a second fax number, 626-798-9546. UCA 2 stated that he had received the payment for the sale of the Vicor shipment. UCA 2 asked CHU how he would pay for shipping of the Vicor product, and advised that CHU should pay for the shipping charges with cash.

139.    On May 4, 2004, UCA 2 contacted BAI via the 963.net address. UCA 2 wrote that he had received the final payment in the amount of $57,032.00. UCA 2 further wrote that he had confirmed with CHU that CHU and ZHU would be arriving in Boston on Wednesday, and that he (UCA 2) would pick up ZHU and CHU at the airport on Wednesday morning.

140.    Also on May 4, 2004, BAI contacted that SAC Boston U/C company via the 963.net address. BAI stated that he had received UCA 2's kind message and would check with ZHU and advise UCA 2.

141.    Also on May 4, 2004, UCA 2 faxed the following message to telephone numbers 626-300-8188 and 626-798-9546. UCA 2 wrote that he had received the wire transfer of $57,032.00 representing the final payment for the Vicor shipment. UCA 2 further requested that CHU advise him (UCA 2) what his travel plans were so that he could pick CHU and ZHU up at the airport.

142.    Also on May 4, 2004, UCA 2 contacted BAI via the 963.net address. UCA 2

wrote that he had received the final payment in the amount of $57,032.00. UCA 2 further wrote that he had spoken with CHU the previous evening, and had confirmed that ZHU and CHU would be arriving in Boston on Wednesday, May 5, 2004. UCA 2 further wrote that he would pick up ZHU and CHU at the airport. UCA 2 wrote that he would be meeting with CHU and ZHU on Thursday, and that BAI's previous instructions were not to discuss the TWT sale with CHU. UCA 2 then asked that since CHU would be traveling with ZHU, whether it was okay to discuss the details of the TWT sale with both CHU and ZHU.

143.   On May 4, 2004, at the request of the SAC Boston, the DOS DDTC ruled, in a second level review, that CPI part number VTU-5192A7A, the pulsed traveling wave amplifier, was listed on the United States Munitions List in Category XI(c). As such, an export license would be required from DOS for export of the VTU-5192A7A, and CPI part number VTU-5192A7A cannot be exported to the P.R.C., which is an embargoed country for export of Munitions List defense articles.

144.   On May 5, 2004, UCA 2 attempted to contact CHU at telephone number 626-437-2370. The call went directly to voice mail. The phone call was recorded. UCA 2 stated that he had received the final payment for the Vicor shipment. UCA 2 further stated that he had faxed him a receipt of the payment to both fax numbers CHU had given him. UCA 2 requested the travel information so that he could make arrangements to pick them up at the airport.

145.   Also on May 5, 2004, UCA 2 picked up ZHU and CHU at Logan International Airport, and drove them to their hotel.

146.   Also on May 5, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he had contacted ZHU, and that it was no problem to talk about the TWT with both ZHU and CHU. BAI further wrote that UCA 2 could feel free to discuss it

with them.

147. Also on May 5, 2004, UCA 2 contacted via telephone number 011-86-13-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. The phone call was recorded, the person on the receiving end of the call identified himself as BAI, and UCA 2 understood him to be the same person he had previously spoken to by telephone. UCA 2 advised BAI that he had picked up ZHU and CHU, and that one TWT was received from the manufacturer. UCA 2 further asked BAI if he could speak with ZHU and CHU about the TWTs.

148. Also on May 5, 2004, BAI contacted the SAC Boston U/C company via the 963.net address. BAI wrote that he had contacted ZHU, and that it was no problem to talk about the TWT with both ZHU and CHU. BAI further wrote that UCA 2 could feel free to discuss it with them.

149. Also on May 5, 2005, BAI contacted UCA 2 on the SAC Boston U/C company telephone. The phone call was recorded, the caller identified himself as BAI, and UCA 2 recognized the voice as the person he previously spoke to by telephone understanding him to be BAI. BAI stated that he had spoken with ZHU, and that there was no problem speaking with ZHU and CHU about the TWTs. UCA 2 stated that he had received the TWT from the manufacturer and he would bring it to the meeting with ZHU and CHU. UCA 2 asked about the $6,000.00 deposit, and BAI stated that this would be placed at the proper time. UCA 2 stated that he had two units on hold and he needed a deposit. BAI stated that it was not a good time because he (ZHU) was in the United States now. BAI further stated that only two units was not good, because they are difficult to ship out. BAI said he wanted to ship ten units at a time, because it takes a special effort to do it. UCA 2 stated he could contact the manufacturer about eight more pieces, and he requested a purchase order from BAI. BAI stated he could provide

that after he returned to the office from vacation on May 8, 2004. BAI also stated that UCA 2 could also discuss with ZHU what would be a good time to place the purchase order, and that maybe he would place the order after ZHU left the United States.

150. On May 6, 2004, before meeting with ZHU and CHU, UCA 2 was outfitted with a disguised body recorder. The conversations detailed below were recorded.

151. UCA 2 met CHU in Cambridge, Massachusetts. CHU accepted delivery of the Vicor military power converters. UCA 2 provided CHU with an inoperable TWT manufactured by CPI for ZHU's inspection. CHU advised that he and UCA 2 were to meet with ZHU at the Marriott Hotel in Cambridge, Massachusetts. CHU then loaded the Vicor products into his rental vehicle, along with the TWT.

152. UCA 2 and CHU proceeded to the Marriott Hotel, where they picked up ZHU. CHU indicated that they would meet over lunch. UCA 2 suggested that they go to Jimmy's Harborside Restaurant in South Boston. UCA 2 outlined that he had made contact with BAI regarding the purchase of the TWTs, and attempted to obtain further details regarding the transaction from ZHU and CHU. UCA 2 pointed out the sample TWT he had made available for ZHU to inspect. CHU, who interpreted for ZHU, told UCA 2 that they would discuss the TWT order at the meeting over lunch. UCA 2 outlined the discussions he had had with BAI regarding the purchase of TWTs, and the fact that two were available immediately. CHU said that for security reasons, they would "watch this one. Then, when we leave, we'll place order." CHU further stated that "when we go back, I'll tell you." UCA 2 stated that the TWTs needed a State Department export license, and that one couldn't be obtained for China. CHU mentioned to ZHU in Chinese that he was afraid of being tape recorded during the meeting. CHU asked UCA 2 if he had two TWT units available in Boston. UCA 2 replied that only one was in Boston; he

-54-

said that the other was in California.

153. When UCA 2, ZHU and CHU arrived at the parking lot outside Jimmy's Harborside Restaurant, CHU opened the rear door of the rental vehicle, and CHU then opened the box containing the TWT. ZHU visually inspected it, asked in what year it was manufactured, and recorded the model number and other information from the labeling on the TWT onto a slip of paper. ZHU also asked UCA 2 if the TWT was used, to which UCA 2 replied that it was new and taken from stock.

154. UCA 2 then returned the TWT to its box, and placed it back in the rental vehicle. The three men then entered the restaurant. They proceeded to the second floor dining area, and were seated by a window. UCA 2 placed the disguised recording device on the table. CHU and ZHU focused their attention on the disguised recording device, and ZHU physically picked it up and appeared to attempt to shut it off. Shortly thereafter, two ICE special agents, designated as a cover team, sat down at a table directly behind ZHU and CHU. ZHU and CHU immediately insisted upon getting up and moving to another table, approximately four tables from the table at which they were originally seated. UCA 2 reiterated the discussions and e-mail correspondence he had had with BAI regarding the purchase of TWTs. UCA 2 advised ZHU and CHU that, similar to the Vicor products, these items were restricted, and required a DOS license to export. UCA 2 advised them that they could not get such a license to export the TWTs to China.

155. UCA 2 reviewed with ZHU and CHU that the agreed-upon price was $30,000.00 per unit, and that the total quantity was 40 units. UCA 2 told ZHU and CHU that the standard delivery is 180 days from the date the order is placed, and that UCA 2 would need to advise the manufacturer and get a deposit if ZHU and CHU wanted to take the two units available at present. UCA 2 also stated that the time from order to delivery could be expedited if they were

willing to pay a premium. After some discussion, which included consideration of two scheduled deliveries of 20 units each, ZHU and CHU settled on a schedule anticipating four deliveries of ten units each. CHU, in concert with ZHU, hand wrote a delivery schedule, indicating how they wanted the delivery of the forty TWTs distributed. ZHU and CHU wanted ten units ordered in May, and an additional ten units ordered once every other month for the following six months.

156.  ZHU and CHU acknowledged that delivery of the TWTs would be handled in the same fashion as the delivery of the Vicor products; that is, that UCA 2 would make a domestic sale in the United States. ZHU and CHU insisted that the sale not reflect a sale to their company in Los Angeles. Rather, ZHU and CHU told UCA 2 that he needed to figure out a way of getting the TWTs to them without providing any information which could tie the sales to them. ZHU and CHU agreed that it would then be their responsibility to get the TWTs out of the United States. UCA 2 expressed concern that these items were larger than the Vicor products, and therefore more difficult to conceal. UCA 2 pressed ZHU and CHU for specifics as to how they could accomplish that concealment without getting caught. UCA 2 also advised that shipping the TWTs by air would be risky. ZHU and CHU did not give specifics as to how they would accomplish the export of the TWTs, but assured UCA 2 that they would take care of it. ZHU and CHU each mentioned that a number of people had been caught conducting such transactions. ZHU indicated that only he, CHU and BAI were privy to the TWT transaction. UCA 2 stated that it was good to minimize the number of people who were aware of the transaction, and that only he and UCA 1 were aware of it from their side. UCA 2 further stated that BAI had indicated that ZHU and an unidentified individual would be meeting with UCA 2

about the sale of the TWTs, and that UCA 2 was happy that no other individual had been introduced into the transaction. ZHU, through CHU, asked UCA 2 if he wanted to receive the payment for the TWTs in cash. UCA 2 said that he thought that would be better for all parties.

157.  UCA 2 also inquired about the status of the night vision equipment. ZHU said that they were still looking for customers. UCA 2 advised ZHU and CHU that BAI had requested a quote for another model GyroChip. ZHU stated that that particular model was a less sensitive model.

158.  UCA 2 advised ZHU and CHU that if they wished to purchase the two TWTs currently available, he would need $6,000.00, representing a 10% down payment for those two units. UCA 2 stated he would permit them to apply $6,000.00 of the payment for the Vicor products as the down payment in order to hold the TWTs for ZHU and CHU. ZHU and CHU agreed to that arrangement.

159.  As UCA 2, ZHU and CHU left the restaurant parking lot in the rental vehicle, UCA 2 was recapitulating the terms of the agreement, and said, "So tomorrow I'll get a purchase order," and also asked how they were going to pay for the deposit. CHU said that they would wire the money tomorrow. UCA 2 indicated toward ZHU and said "cash." In Chinese, ZHU said to CHU that they were going to wire the money from Hong Kong. UCA 2 said that he would contact the manufacturer to ask them to hold onto the two TWTs. CHU said, "I'll tell you tomorrow." UCA 2 said, "Should I expect the money from Sunny [BAI] or should I expect it from L.A.?" CHU said "Sunny."

160.  UCA 2, ZHU and CHU proceeded to Terminal B at Logan International Airport in the rental vehicle. When they arrived at the airport, CHU unloaded the four boxes of Vicor

-57-

products, putting them onto a luggage cart. At the direction of CHU, UCA 2 escorted ZHU upstairs to the ATA ticket counter area. UCA 2 then returned to the rental vehicle, retrieved his briefcase and the CPI TWT, and CHU departed in the rental vehicle to the return it. Other ICE agents maintained surveillance on ZHU. Once UCA 2 had departed the area and CHU returned to the ATA ticket counter area, ZHU and CHU left the ATA area and proceeded to the AmericaWest ticket counter area, where they purchased tickets to travel on AmericaWest flight 409, a non-stop flight to Los Angeles, California. Flight 409 departed Boston shortly after 5:30 p.m., and was scheduled to land in Los Angeles at 8:25 p.m. Pacific Daylight Time.

WHEREFORE, I believe that probable cause exists that from a date unknown, but not later than March 25, 2004, and continuing up to and including May 6, 2004, at Boston, and elsewhere, within and without the United States, ZHU Zhaoxin and John CHU did unlawfully, willfully, and knowingly combine, conspire, confederate and agree with one another and with one or more other persons, known and unknown, to commit offenses against the United States, to wit: to export defense articles or defense services designated by the President under 22 U.S.C. § 2778(a)(1) without a license for such export, in violation of 22 U.S.C. § 2778(b)(2) and (c), all in violation of 18 U.S.C. § 371.

_____
WILLIAM J. ARGUE
Special Agent
Immigration and Customs Enforcement

Sworn to before me this 6th day of May 2004, under the pains and penalties of perjury, at Boston, Brookline Massachusetts.

_____
MARIANNE B. BOWLER
Chief United States Magistrate Judge

-58-